**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF WEST VIRGINIA
CLARKSBURG DIVISION**

**RICHARD L. ARMSTRONG,**
        *Plaintiff*,

v.                                                               **Civil Action No.: 1:19-CV-173
(Honorable Judge Keeley)**

**ANTERO RESOURCES CORPORATION,**
        *Defendant*.

**and**

**DONALD R. REYNOLDS**
        *Plaintiff*,

v.                                                               **Civil Action No.: 1:19-CV-173
(Honorable Judge Keeley)**

**ANTERO RESOURCES CORPORATION,**
        *Defendant*.

**MEMORANDUM IN SUPPORT OF PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT**

**I.  INTRODUCTION**

Pursuant to Fed. R. Civ. P. 56(a), Plaintiffs move for partial summary judgment in their favor on the issue of liability on their claims for breach of contract under Count III of their respective complaints against Defendant Antero Resources Corporation ("Antero").

Plaintiffs are lessors under oil and gas leases with Antero covering leased premises located in Doddridge County, West Virginia. There is no language in the natural gas royalty provisions in either of Plaintiffs' leases providing that "the lessor shall bear some part of the costs incurred between the wellhead and the point of sale, [or which] identif[ies] with particularity the specific deductions the lessee intends to take from the lessor's royalty . . . ." *Estate of Tawney v. Columbia Natural Resources, L.L.C.*, 633 S.E.2d 22, 30 (W. Va. 2006). In fact, the leases expressly provide

the opposite in that as to both Plaintiffs the leases, as modified, state that royalties should be paid "without deduction, directly or indirectly, for the cost of producing, gathering, storing, separating, treating, dehydrating, compressing, processing, transporting, and marketing the oil, gas and other products produced hereunder to transform the product into marketable form." Accordingly, Antero is obligated to pay royalties on the natural gas produced under each Plaintiffs' lease based upon prices received by Antero on its sale of natural gas products at the point of sale. *Id.*; *Wellman v. Energy Resources, Inc.*, 557 S.E.2d 254, 265 (W. Va. 2001) (recognizing that lessors should receive their percentage share "of the sale price received by the lessor.").

In calculating and paying royalties to Plaintiffs, Antero has not paid royalties based upon the prices received by Antero on its sale of natural gas products. Instead, with respect to natural gas liquids ("NGLs") produced in connection with the subject leases, Antero has considered post-production costs through the use of a so-called "Shrink Value" method of paying royalties on NGLs, which has the effect of depriving Plaintiffs of a royalty based on the full value of the NGLs received by Antero at the point of sale. Antero has therefore, as a matter of law, breached its contractual obligations to Plaintiffs under the leases at issue.

## II. STATEMENT OF MATERIAL FACTS

1. Plaintiffs, Richard L. Armstrong and Donald R. Reynolds, are the successors-in-title to oil and gas interests underlying approximately 600 acres in West Union District, Doddridge County, West Virginia. [Armstrong Amended Complaint ("Armstrong Am. Compl."), ¶¶ 5-9, Armstrong ECF No. 20; Antero Answer to Armstrong Am. Compl., ¶¶ 5-9, Armstrong ECF No. 21; Armstrong Amended Complaint ("Reynolds Am. Compl.") ¶¶ 5-9, Reynolds ECF No. 18; Antero Answer to Reynolds Am. Compl., ¶¶ 5-9, Reynolds ECF No. 19.]

2. These oil and gas interests are subject to a lease dated April 15, 1913 from Joseph Freeman and Flora Freeman, his wife, to G.H. Trainer and J.E. Trainer. The lease was recorded in the Office of the Doddridge County Clerk in Lease Book 27, at Page 233 (hereafter referred to as the "Freeman Lease"). Under the Freeman Lease, the Lessees agreed to pay to the Lessors "1/8 part of all oil produced and saved from the leased premises; and 2nd to pay One Hundred ($100.00) each three months in advance for the gas from each and every gas well drilled on said premises, the product from which is marketed and used off the premises, said payment to be made on each well within sixty days after completion of well and to be paid three months thereafter while the gas from said well is used." [Armstrong Am. Compl., ¶ 10 & Ex. A, Armstrong ECF No. 20-1; Antero Answer to Armstrong Am. Compl., ¶ 10; Reynolds Am. Compl., ¶ 10 & Ex. A, Reynolds ECF No. 18-1; Antero Answer to Reynolds Am. Compl., ¶ 10.]

3. Thereafter, the Freeman Lease was modified by an agreement dated March 18, 1925, which was executed by Joseph Freeman, Flora Freeman, G. H. Trainer, J.E. Trainer, and the then-current assignee of the Freeman Lease, Clifton Oil & Gas Company. Specifically, the agreement amended the compensation and related terms as follows:

> "NOW, THEREFORE, in consideration of the premises, it is agreed by and between the parties hereto that from and after the date hereof, the party of the second part shall pay and deliver unto the parties of the first part, as full consideration for the gas from each and every gas well which may be hereafter drilled upon said premises, and from all the oil wells now drilled upon said premises, or which may be hereafter drilled upon said premises, ***the equal one eighth (1/8) part of all the natural gas which may be produced and marketed from said wells, or any of them, both gas wells and oil wells, (except the two gas wells now producing gas on said premises), so long as the party of the second part, its successors or assigns, shall market the gas from said wells, or any of them, off the premises.***
>
> ***It is further agreed by and between the parties hereto, that the parties of the first part shall sell to the party of the second part and that the party of the second part shall purchase from the parties of***

> *the first part all the said one-eighth of the said gas produced and marketed from said premises, at the same price and upon the same terms and conditions as all the gas from said leased premises is now being marketed, or shall be hereafter marketed by the party of the second part, its successors or assigns*; and settlement shall be made monthly, on or before the last day of every month, for the said royalty gas delivered to the credit of the parties of the first part during the preceding month; and the party of the second part shall also furnish to the parties of the first part a true and correct statement of the entire amount of gas produced and saved from said leased premises during the preceding month, except the said two gas well which are now producing gas, which are not included in this agreement. And in the event the parties of the first part are not satisfied with such statements of amount of gas delivered and sold from said premises, the parties of the first part, by themselves or their agent, shall have the right of access for and inspection of the original meter charts taken from said wells; and they may also inspect the statements furnished by the Company that purchases all the gas from said wells. Second party shall pay for all gas used by it off said premises...."

[Armstrong Am. Compl., ¶ 13 & Ex. B, Armstrong ECF No. 20-2; Antero Answer to Armstrong Am. Compl., ¶ 13; Reynolds Am. Compl., ¶ 13 & Ex. B, Reynolds ECF No. 18-2; Antero Answer to Reynolds Am. Compl., ¶ 13.]

4. As relevant here, the Freeman lease was subject to two additional modifications—one affecting Armstrong's interest and one affecting Reynolds' interest.

5. A Modification dated August 28, 2015, was entered into between the Eugene H. Armstrong Estate (by Richard L. Armstrong) and Defendant Antero. This Modification ratified the Freeman Lease and supplemented the terms thereof and amendments thereto by adding the following:

> 1. OIL AND GAS ROYALTY. Lessee shall pay Lessor royalty of One Eighth (12.5%) of the amount realized by Lessee from the sale of any oil and gas present in and associated with any formations, horizons, strata or zones produced and sold by Lessee. For all purposes of Addendum, references to oil and gas or either or both of them shall mean oil, or gas, or both and all substances which are

4

> constituents of or produced with oil or gas, whether similar or dissimilar or produced in a gaseous, liquid, or solid state. It is agreed between the Lessor and Lessee that, notwithstanding any language herein to the contrary, all oil, gas or other proceeds accruing to the Lessor under this lease or by state law shall be ***without deduction, directly or indirectly, for the cost of producing, gathering, storing separating, treating, dehydrating, compressing, processing, transporting, and marketing the oil, gas and other products produced hereunder to transform the product into marketable form.*** In no event shall Lessor receive a price that is less than, or more than, the price received by Lessee.

[Armstrong Am. Compl., ¶ 24 & Ex. C, Armstrong ECF No. 20-3 (emphasis added) Antero Answer to Armstrong Am. Compl., ¶ 24.]

6. A Modification dated July 8, 2014 was entered into between Donald R. Reynolds and Defendant Antero. This Modification ratified the Freeman Lease and supplemented the terms thereof and amendments thereto by adding the following:

> <u>Market Enhancement (Gross Proceeds) Clause</u>: It is agreed between the Lessor and Lessee that all oil, gas, liquids or other proceeds accruing to the Lessor under this lease or by state law shall be ***without deduction, directly or indirectly, for the cost of producing, gathering, storing, separating, treating, dehydrating, compressing, processing, transporting and marketing the oil, gas liquids and other products produced hereunder to transform the product into marketable form.***

[Reynolds Am. Compl., ¶ 24 & Ex. C, Reynolds ECF No. 18-3 (emphasis added); Antero Answer to Reynolds Am. Compl., ¶ 24.]

7. At various times, and continuing through the present, Antero has produced natural gas from the wells subject to the Freeman Lease, as modified. Thereafter, Antero drilled horizontal Marcellus Shale wells that unitized portions of the Freeman Lease, including those portions owned by Plaintiffs. [Armstrong Am. Compl., ¶¶ 28-31; Antero Answer to Armstrong Am. Compl., ¶¶ 28-31; Reynolds Am. Compl., ¶¶ 28-31; Antero Answer to Reynolds Am. Compl., ¶¶ 28-31.]

8. The gas Antero produces from Plaintiffs' gas wells is "wet gas," which contains primarily methane, but also contains natural gas liquid (NGL) hydrocarbons including ethane, propane, normal butane, iso-butane, and natural gasoline. After the wet gas emerges from the well it is "conditioned"—a process which separates heavier liquids from the raw gas. [Rule 30(b)(6) Deposition of Alvyn Schopp ("Schopp Depo.") at 28, attached hereto as **Exhibit 1**.] The remaining gas enters a gathering system, where it is commingled with gas from other wells and typically transported to a processing plant. At the processing plant, the NGL components of the gas are extracted and collected into a Y-Grade mix of NGLs. The gas which remains after the NGLs are extracted is commonly referred to as "residue gas." [*Id.*, at 35-36; Expert Report of Kris L. Terry ("Terry Expert Report") at pp. 3-4, ¶ 8, attached hereto as **Exhibit 2**.]

9. The residue gas is delivered from the processing plant into a transmission pipeline. Typically, Antero sells residue gas which has been obtained from Plaintiffs' wells to customers at points of sale which are connected to long-distance transmission pipelines, and Antero invoices its customers for such residue gas at those points of sale. [Ex. 1, Schopp Depo., at 36; Ex. 2, Terry Expert Report, at pp. 4-5, ¶ 12].

10. The Y-Grade mix of NGLs which are extracted at the processing plant is transported to a fractionation facility, where it is fractionated into identifiable NGL products, including ethane, propane, normal butane, iso-butane, and natural gasoline. Antero, or its agent, MarkWest, sells these NGL products to Antero's customers at points of sale which are at or near the outlet of the fractionation facility or transports them by pipeline or rail for sale at other locations. [Ex. 1, Schopp Depo. at 36-38; Deposition of Kris L. Terry ("Terry Depo.") at 27-28, attached hereto as **Exhibit 3**.]

11.  As detailed below, in calculating the royalties paid to Plaintiffs, Antero has consistently calculated such royalties based upon a dollar amount which is less than the amount of proceeds which Antero has been paid on its sale of NGL products at the point of sale.

12.  With respect to Antero's calculation of royalties paid to Plaintiffs from Antero's sale of NGLs, Antero makes two separate calculations to determine such royalties. Antero's selection of which calculation it uses to determine the royalty for NGLs in any given month is dependent on market conditions and "an arbitrary but consistently applied formula created by Antero." [Expert Report of Donald A. Phend, CPA ("Phend Expert Report") at p.7, ¶ 14, attached hereto as **Exhibit 4**; Deposition of Donald A. Phend ("Phend Depo.") at 132-33, attached hereto as **Exhibit 5**.]

13.  Antero first makes a calculation of the "NGL Value," where Antero starts with the revenues received from Antero's sale of NGL products to Antero's customers, and then deducts various costs related to processing and fractionating the NGLs. [Antero's Response to Plaintiffs' Interrogatory No. 4, attached hereto as **Exhibit 6**.]

14.  Antero then makes a so-called "Shrink Value" calculation, where Antero calculates the volume of the natural gas used to produce the NGLs, calculated on a per MMBTU basis, multiplied by a weighted average sales price (WASP) for Antero's sales of residue gas. In making this Shrink Value calculation, Antero does not take into account the revenues that Antero received on its sale of NGL products to its customers. [*Id.*]

15.  In paying royalties related to NGLs, Antero compares the NGL Value to the Shrink Value, and pays Plaintiffs royalties on the higher amount. [*Id.*; Ex. 1, Schopp Depo., at 47-49.] But since the NGL Value is calculated net of post-production costs, even where Plaintiffs are not ultimately charged such costs they are nevertheless paid less in royalties than they would be if the

7

NGL Values used for comparison were calculated on the basis of the gross amount realized from the sale of the NGLs, without deductions for post-production costs.

16. Because "the price of NGLs per MMBTU is almost always significantly higher than the price of Residue Gas per MMBTU," the royalties paid to Plaintiffs under this Shrink Value method are consistently less than the royalties they would have received if they were paid royalties based upon prices received by Antero on its sale of NGL products at the point of sale. [Ex. 4, Phend Expert Report, at p. 7, ¶ 15].

17. Plaintiffs' expert, Donald A. Phend, CPA, calculated Antero's underpayment of royalties resulting from Antero's failure to pay Plaintiffs royalties based upon the full value received on the NGLs at the point of sale. First, Phend subtracted the Gross Shrink Value from the Gross NGL Value for each well, providing a "gross well differential resulting from using Shrink Value to pay royalties." Then he multiplied the gross well amount "by Plaintiffs' decimal interest for each well and month where the Shrink Value was used." The underpayment for each Plaintiff was $47,762.30, for a total of $95,524.60 as of the March 2020 production month,[1] exclusive pre-judgment interest. [Ex. 4, Phend Expert Report, at pp. 6-8, ¶¶ 13-16].

18. Thus, in calculating and paying royalties to Plaintiffs for its NGL sales, Antero has consistently paid royalties which are less than the royalties Plaintiffs would have received if they had been paid based upon prices received from Antero's sale of NGL products to third party-purchasers at the point of sale. Importantly, even if Antero did not directly deduct post-production costs from Plaintiffs' royalties, its netting of such costs in the process of determining whether it

---

[1] Plaintiffs anticipate that Antero will seasonably supplement the data it has provided so as to permit Plaintiffs' expert to provide an updated calculation at the time of trial.

would pay royalties on NGLs in any given month had the effect of causing Plaintiffs to be denied royalties they were owed under the subject leases.

### III.     SUMMARY JUDGMENT STANDARDS

Under Federal Rule of Civil Procedure 56(c), summary judgment should be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The party seeking summary judgment bears the initial burden of showing the absence of any genuine issues of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986). Once the party seeking summary judgment meets the initial burden of showing that there is no genuine issue of material fact, "[t]he burden then shifts to the nonmoving party to come forward with facts sufficient to create a triable issue of fact." *Temkin v. Frederick County Comm'rs,* 945 F.2d 716, 718 (4th Cir. 1991), *cert. denied,* 502 U.S. 1095 (1992) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48 (1986)).

"[A] party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 256. Although the Court must view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor." *Anderson,* 477 U.S. at 256. The nonmoving party must satisfy its burden of proof by offering more than a mere "scintilla of evidence" to support its position. *Anderson,* 477 U.S. at 252. Likewise, conclusory allegations or unsupported speculation, without more, are insufficient to preclude the granting of a summary judgment motion. *See Felty v. Graves–Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir. 1987); *Ross v. Comm'n Satellite*

9

*Corp.,* 759 F.2d 355, 365 (4th Cir. 1985), *abrogated on other grounds, Price Waterhouse v. Hopkins,* 490 U.S. 228 (1989).

### IV. ARGUMENT

**Plaintiffs' Leases With Antero, As Modified, Do Not Expressly Authorize Deductions For Post Production Costs; Therefore, Antero Has Breached The Lease By Using Such Deductions To Reduce The Royalties To Which Plaintiffs Are Contractually Entitled**

In this case, not only do the subject leases not "expressly" permit the deduction of post-production costs, but they unambiguously ***prohibit*** such costs from being used to reduce the royalties owed to a lessor. Under established West Virginia substantive law, the lessee to an oil and gas lease should ordinarily "bear the costs associated with marketing products produced under a lease." *Wellman v. Energy Resources, Inc.*, 557 S.E.2d 254, 265 (W. Va. 2001). This legal principle is consistent with West Virginia's recognition that "traditionally in this State the landowner has received a royalty based on the sale price received by the lessee." *Estate of Tawney v. Columbia Nat'l Resources*, LLC, 633 S.E.2d 22, 27 (W. Va. 2006). Moreover, "language in an oil and gas lease that provides that the lessor's 1/8 royalty . . . is to be calculated 'at the well', 'at the wellhead', or similar language, . . . is ambiguous and, accordingly, is not effective to permit the lessee to deduct from the lessor's 1/8 royalty any portion of the costs incurred between the wellhead and the point of sale." *Id*. at 30. Instead,

> "language in an oil and gas lease that is intended to allocate between the lessor and lessee the costs of marketing the product and transporting it to the point of sale ***must expressly provide that the lessor shall bear some part of the costs*** incurred between the wellhead and the point of sale, identifying with particularity the specific deductions the lessee intends to take from the lessor's royalty (usually 1/8), ***and indicate the method of calculating the amount to be deducted*** from the royalty for such post-production costs." Id. (emphasis added)

633 S.E.2d at 30.

In fact, this court has indicated that the *Wellman/Tawney* line of cases creates a "presumption" that the lessee must bear all post-production costs. To overcome that presumption, the lessee must identify a specific lease provision that is "unambiguous enough to escape" the strict test established in *Wellman* and *Tawney*. *Corder v. Antero Resources Corp.*, 322 F.Supp.3d 710, 719 (N.D. W. Va. 2018); *see also Romeo v. Antero Resources Corp.*, No. 1:17-CV-88, 2018 WL 4224452 at *5 (N.D. W. Va. Sept. 5, 2018) (reiterating authority of *Wellman* and *Tawney*, and concluding that lease clauses, "value at the well" or "gross proceeds received from the sale of the same at the prevailing price," did not permit the deduction of post-production costs).

Here, neither of Plaintiffs' leases contain any language authorizing Antero to deduct any post-production costs or otherwise use such costs to reduce the royalties owed on the sale of NGLs. If anything, they specifically ***prohibit*** the very kind of cost deductions Antero has used to calculate Plaintiffs' royalties using the methodology described above. The modifications to the Freeman Lease signed by Plaintiffs, which were written by Antero itself, provide that all oil, gas, and other byproducts produced by Antero "shall be ***without deduction, directly or indirectly***" for the costs necessary "to transform the product into marketable form." To be sure, the modifications specify that ***no costs*** associated with "producing, gathering, storing, separating, treating, dehydrating, compressing, processing, transporting [and] marketing" the oil, gas, or other byproducts may be deducted from royalties that are due and owing.

In this case, there is no ambiguity as to Antero's right to consider post-production costs in calculating Plaintiffs' royalties. But even if there were, general contract law, of course, requires that any ambiguities must be construed against the party who prepared it—i.e., Antero. *See, e.g.*, *Consol Energy, Inc. v. Hummel*, 238 W. Va. 114, 122, 792 S.E.2d 613 (2016) ("It is a well-accepted principle that ambiguities in a contract should be construed against the drafter."). But

11

*Wellman* and *Tawney* go far beyond that. These two cases provide that leases must identify *express* language in the lease (1) authorizing cost-shifting, and (2) setting forth the methodology to be used in calculating the cost deductions. Antero has utterly failed to satisfy these requirements.

Up to this point, Antero has been unwilling to explain its rationale for why the plain, unambiguous language of Plaintiffs' leases should be disregarded. Lessees in other cases have argued that the *Wellman/Tawney* line of cases only applies to certain kinds of oil and gas leases. But Judge Kleeh recently rejected that argument in *Cather v. EQT Production Co.*, No. 1:17-CV-208, 2019 WL 3806629 (N.D. W. Va. Aug. 13, 2019). The lease in *Cather* provided that royalties were to be paid based upon 1/8 "of the wholesale market value." Judge Kleeh found that *Tawney* "does not limit its own application to any particular lease language." Instead, *Tawney* "provided a roadmap to Defendants and other lessees on how to properly, legally deduct post-production expenses from royalty payments in the state of West Virginia." *Cather*, 2019 WL 3806629 at *4. Consequently, *Tawney* applies to Plaintiffs' leases. Because Antero failed to follow *Tawney's* "roadmap," post-production costs cannot be deducted or otherwise considered in calculating royalties payable to Plaintiffs.

Antero may argue that its deductions are not deductions at all, but instead are the result of a permissible "workback." In the case of *W.W. McDonald Land Co. v. EQT Prod. Co.*, 983 F. Supp. 2d 790 (S.D. W. Va. 2013), *opinion clarified* (Jan. 21, 2014), Judge Goodwin specifically rejected the industry practice of reducing royalty payments by means of "workback" and found that "*Tawney's* specificity requirements apply to royalty payments made under [EQT's] work-back method." In his discussion of EQT's improper use of workback, Judge Goodwin made the following pointed observation about the practice:

> "Finally, the defendants argue that *Tawney* is inapplicable because EQT Production sells gas at the wellhead and, since 2005, has taken

12

> no monetary deductions from royalties. However, EQT Production sells the gas at the wellhead to EQT Energy, a sister company. The defendants cannot calculate royalties based on a sale between subsidiaries at the wellhead when the defendants later sell the gas in an open market at a higher price. Otherwise, gas producers could always reduce royalties by spinning off portions of their business and making nominal sales at the wellhead. I predict with confidence that, if confronted with this issue, the Supreme Court of Appeals would hold the same. See *Howell v. Texaco, Inc.*, 112 P.3d 1154 (Okla.2004) ("an intra-company contract is not an arm's length transaction, [and] it is not a legal basis on which [a producer] can calculate royalty payments"); *Beer v. XTO Energy, Inc*., CIV–07–798–L, 2010 WL 476715 (W.D. Okla. Feb. 5, 2010) (gas sale at wellhead between two controlled, affiliated companies not appropriate for royalty calculation).
>
> Further, in order to determine a wellhead price at which EQT Production sells gas to EQT Energy, defendants essentially admit they continue to deduct post-production expenses. To determine the wellhead price, the defendants use a "work-back method" which "involves subtracting post-production costs that enhance the value of the gas from the interstate connection price." . . . . Absent lease language to the contrary, *Tawney* requires lessees to pay royalties free of these costs. The defendants cannot avoid *Tawney* by simply reorganizing their businesses and making intra-company wellhead sales."

983 F. Supp. 2d, at 804.

The argument against workback is even stronger in this case because the Antero-authored lease modifications prohibit costs from being deducted "directly or indirectly." As Judge Goodwin correctly noted, workback "involves subtracting post-production costs that enhance the value of gas from the interstate connection price." In other words, it is simply an ***indirect*** method of deducting post-production costs. Therefore, not only is the workback method of calculating royalties contrary to West Virginia common law, it is also contrary to the express language of Plaintiffs' lease modifications.

Even under the ordinary rules governing the construction of contracts, it is clear that Antero cannot reduce Plaintiffs' royalties by considering post-productions costs. This is ever the more so

13

in light of the public policy embodied in *Wellman* and *Tawney*. The Supreme Court has set a high bar for lessees to overcome before any post-production costs may be deducted. Antero cannot point to any lease language that expressly authorizes the deductions it has consistently made from Plaintiffs' royalties. Therefore, Plaintiffs are entitled to a partial summary judgment stating: (1) that Plaintiffs' leases, as modified, do not expressly authorize deductions for post-production costs and, therefore, do not satisfy the *Wellman/Tawney* test, and (2) that Antero has breached Plaintiffs' leases by taking deductions into account when determining how its pays Plaintiffs for NGLs and otherwise failing to pay them the full royalties to which they were entitled.

## V. CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully request the court to enter summary judgment on Count III of Plaintiffs' complaints as set forth herein.

Dated: January 15, 2021

Respectfully submitted,

*/s/ Victor S. Woods*
Jonathan R. Marshall (WVSB #10580)
Victor S. Woods (WVSB #6984)
Samuel A. Hrko (WVSB #7727)
**BAILEY & GLASSER, LLP**
209 Capitol Street
Charleston, WV 25301
Tel: (304) 345-6555
jmarshall@baileyglasser.com
vwoods@baileyglasser.com
shrko@baileyglasser.com

William E. Ford III (WVSB # 1246)
**FORD LAW OFFICE**
217 East Main St.
Clarksburg, WV 26301
Tel.: (304) 626-3116
clarksburgwvlawyer@gmail.com

Scott A. Windom, Esquire
**WINDOM LAW OFFICES, PLLC**

                                                                        101 East Main Street
                                                                        Harrisville, WV 26362
                                                                        Tel.: (304) 643-4440
                                                                        swindom@windomlawoffices.com

                                                     *Counsel for Plaintiffs*

## **CERTIFICATE OF SERVICE**

    I hereby certify that on January 15, 2021, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF System, Notice of this filing will be sent be e-mail to all parties by operation of the Court's electronic filing system as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

                                                              */s/ Victor S. Woods*
                                                             Victor S. Woods (WVSB #6984)