**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**RICHARD L. ARMSTRONG,**

      **Plaintiff,**

**v.**                                                     **Civil Action No. 1:19-CV-173**
                                                          **Hon. Judge Irene M. Keeley**

**ANTERO RESOURCES CORPORATION,**
                                                          **c/w 1:19-CV-174**

      **Defendant.**

**MEMORANDUM IN SUPPORT OF ANTERO RESOURCES**
**CORPORATION'S MOTION FOR SUMMARY JUDGMENT**

## I.      INTRODUCTION

Defendant Antero Resources Corporation ("Antero") submits this memorandum in support of its motion for summary judgment in these consolidated actions brought by Plaintiffs Richard L. Armstrong and Donald R. Reynolds.  Antero is entitled to summary judgment on the claims in Plaintiffs' amended complaints. First, Antero is entitled to summary judgment on Plaintiffs' claims for specific performance of audit provisions because Plaintiffs base their claims on a 1925 lease modification, which has been superseded, and Armstrong has not complied with the conditions precedent to invoking the audit provision in his 2015 lease modification. Second, Antero is entitled to summary judgment on Plaintiffs' claims for failure to properly account for royalties because Plaintiffs cannot repackage their independent claims for breach of the implied duty of good faith and fair dealing, which have been dismissed with prejudice, as baseless claims for an accounting. Third, Antero is entitled to summary judgment on Plaintiffs' claims for breach of contract for failure to pay royalties due because Plaintiffs failed to identify specific lease terms purportedly breached, Antero has not breached the Freeman Lease as modified, and Antero has paid more royalties than required, so Plaintiffs have no injury as a matter of law.  Therefore, this Court should grant summary judgment to Antero on all claims in Plaintiffs' amended complaints.

## II.   <u>STATEMENT OF THE CASE</u>

Armstrong and Reynolds initiated these actions against Antero by filing a single complaint in the Circuit Court of Doddridge County, West Virginia on August 6, 2019. The complaint was severed and assigned two separate civil action numbers by the Circuit Clerk, being *Armstrong*, No. 19-C-17, and *Reynolds*, No. 19-C-18.  *See Armstrong*, ECF No. 1-1; *Reynolds*, ECF No. 1-1.

Antero removed both actions to this Court based on diversity jurisdiction, and they were again assigned two separate civil action numbers, being *Armstrong*, No. 1:19cv173, and *Reynolds*, No. 1:19cv174.  *See Armstrong*, ECF No. 1; *Reynolds*, ECF No. 1.  Following removal, Antero filed a motion to dismiss in each action.  *See Armstrong*, ECF No. 7; *Reynolds*, ECF No. 5.

In each case, the Court granted in part and denied in part Antero's motion to dismiss.  The Court dismissed with prejudice claims for breach of the duty of good faith and fair dealing and breach of fiduciary duty. The Court granted Armstrong and Reynolds leave to amend their complaints to allege a complete contract.  *See Armstrong*, ECF No. 15; *Reynolds*, ECF No. 13.

Armstrong and Reynolds each filed a three-count amended complaint on February 10, 2020.  *Armstrong*, ECF No. 20; *Reynold*s, ECF No. 18. Count I alleges a claim for breach of contract/demand for specific performance to enforce audit provisions. Count II alleges a claim for failure to properly account for royalties.  Count III alleges a claim for breach of contract for failure to pay royalties due. Armstrong and Reynolds demand an Order requiring Antero to account for all proceeds from the sale of oil, gas, and other by-products from the wells at issue and for all expenses taken therefrom in calculating royalties owed to Armstrong and Reynolds, compensatory damages, attorneys' fees, costs, expenses, pre-judgment and post-judgment interest.

The only lease at issue in this action was entered into by and between Joseph and Flora Freeman and G.H. and J.E. Trainer on April 15, 1913, and recorded in Doddridge County in Lease

Book 27, at Page 233 ("Freeman Lease").[1]  *See Armstrong*, ECF No. 20 at 3, 20-1; *Reynolds*, ECF No. 18 at 3, 18-1.  On March 18, 1925, the Freemans signed a lease modification with Clifton Oil & Gas Company, a successor to the Trainers, which is recorded in Doddridge County in Lease Book 41, at Page 431 ("1925 Freeman Modification").[2]  The 1925 Freeman Modification modified the royalty provision of the Freeman Lease, in part, as follows:

> NOW THEREFORE, in consideration of the premises, it is agreed by and between the parties hereto that from and after the date hereof, the party of the second part shall pay and deliver unto the parties of the first part, as full consideration for the gas from each and every gas well which may be hereafter drilled upon said premises, and from all the oil wells now drilled upon said premises, or which may be hereafter drilled upon said premises, the equal one-eighth (1/8) part of all the natural gas which may be produced and marketed from said wells, or any of them, both gas wells and oil wells, (except the two gas wells now producing gas on said premises), so long as the party of the second part, its successors or assigns, shall market the gas from said wells, or any of them, off the premises.
>
> It is further agreed by and between the parties hereto, that the parties of the first part shall sell to the party of the second part and that the party of the second part shall purchase from the parties of the first part all the said one-eighth of the said gas produced and marketed from said premises, at the same price and upon the same terms and conditions as all the gas from said leased premises is now being marketed, or shall be hereafter marketed by the party of the second part, its successors or assigns; and settlement shall be made monthly, on or before the last day of every month, for the said royalty gas delivered to the credit of the parties of the first part during the preceding month; and the party of the second part shall also furnish to the parties of the first part a true and correct statement of the entire amount of gas produced and saved from said leased premises during the preceding month, except the said two gas wells which are now producing gas, which are not included in this agreement. *And in the event the parties of the first part are not satisfied with such statements of amount of gas delivered and sold from said premises, the parties of the first part, by themselves or their agent, shall have the right of access for and inspection of the original meter charts taken from said wells; and they may also inspect the statements furnished by the Company that purchases all the gas from said wells.* Second party shall pay for all gas used by it off said premises.
>
> And it is further agreed that the record of the measurement of said gas by the Company to which the party of the second part sells said gas, and the settlement between the party of the second part sells said gas, and the settlement between the

---

[1] A copy of the Freeman Lease is attached as "Exhibit A."
[2] A copy of the 1925 Freeman Modification is attached as "Exhibit B."

party of the second part and such purchaser shall be final and binding as between the parties.

Ex. B at 2 (emphasis added).

On May 15, 1926, the Freemans signed another lease modification with Clifton Oil & Gas Company, which is recorded in Doddridge County in Lease Book 42, at Page 323 ("1926 Freeman Modification").[3]

On October 12, 1936, John Doak and U.G. Summers, successors to the Freemans, signed another lease modification with Clifton Oil & Gas Company, which is recorded in Doddridge County in Lease Book 52, at Page 204 ("1936 Doak Modification").[4]

On July 30, 2014, Reynolds, a further successor to the Freemans, signed a modification of oil and gas lease with Antero, a successor to Clifton Oil & Gas Company ("2014 Reynolds Modification").[5] The 2014 Reynolds Modification contains the following royalty provision:

> Market Enhancement (Gross Proceeds) Clause  It is agreed between the Lessor and Lessee that all oil, gas, liquids or other proceeds accruing to the Lessor under this lease or by state law shall be without deduction, directly or indirectly, for the cost of producing, gathering, storing, separating, treating, dehydrating, compressing, processing, transporting, and marketing the oil, gas, liquids and other products produced hereunder to transform the product into marketable form.

Ex. E at 4.

On August 28, 2015, Armstrong, as executor of the Eugene H. Armstrong estate, another further successor to the Freemans, signed a modification of oil and gas lease and an addendum to modification of oil and gas lease with Antero ("2015 Armstrong Modification").[6] The 2015 Armstrong Modification contains the following royalty and audit provisions:

> 1.    OIL AND GAS ROYALTY. Lessee shall pay Lessor royalty of One Eighth (12.5%) of the amount realized by Lessee from the sale of any oil and gas present in and associated with any formations, horizons, strata or zones produced and sold

---

[3] A copy of the 1926 Freeman Modification is attached as "Exhibit C."
[4] A copy of the 1936 Doak Modification is attached as "Exhibit D."
[5] A copy of the 2014 Reynolds Modification is attached as "Exhibit E."
[6] A copy of the 2015 Armstrong Modification is attached as "Exhibit F."

by Lessee. For all purposes of Addendum, references to oil and gas or either or both of them shall mean oil, or gas, or both and all substances which are constituents of or produced with oil or gas, whether similar or dissimilar or produced in a gaseous, liquid, or solid state. It is agreed between the Lessor and Lessee that, notwithstanding any language herein to the contrary, all oil, gas or other proceeds accruing to the Lessor under this lease or by state law shall be without deduction, directly or indirectly, for the cost of producing, gathering, storing, separating, treating, dehydrating, compressing, processing, transporting, and marketing the oil, gas and other products produced hereunder to transform the product into marketable form. In no event shall lessor receive a price that is less than or more than the price received by Lessee.

. . .

4.      AUDIT. Lessor shall have the right to annually examine, audit, or inspect the books, records, and accounts of Lessee pertinent to the purpose of verifying the accuracy of the reports and statements furnished to Lessor, and for checking the amount of payments lawfully due Lessor. *In exercising this right, Lessor shall give notice to Lessee of its intended audit by certified mail, and Lessee shall schedule a time for Lessor within thirty (30) days, and such audit shall be conducted during normal business hours at the office of Lessee at the sole cost and expense of Lessor, and in no case will Lessor be permitted to take documents or copies of documents outside Lessee's office.*

Ex. F at 5 (emphasis added).

Antero served its answers to the amended complaints on February 24, 2020. The answers deny any liability to Armstrong and Reynolds and plead several affirmative defenses, including failure to perform conditions precedent to requesting relief. *See Armstrong*, ECF No. 21 at 8; *Reynolds*, ECF No. 19 at 7–8.

On May 8, 2020, the Court consolidated these actions for all purposes. *See Armstrong*, ECF No. 32; *Reynolds*, ECF No. 30. Discovery has been completed, and trial is scheduled to begin on July 19, 2021. *Armstrong*, ECF No. 33.

III.   **DISCUSSION**

A.   **Standard of Decision and Controlling Law.**

Summary judgment is appropriate where the "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" establish that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c)(1)(A). The Court must view the evidence "in the light most favorable to the nonmoving party." *Providence Square Assocs., L.L.C. v. G.D.F., Inc.*, 211 F.3d 846, 850 (4th Cir. 2000). The Court must avoid weighing the evidence or determining the truth and determine only whether genuine issues of triable fact exist. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of informing the Court of the basis for the motion and establishing the nonexistence of genuine issues of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met that burden, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256 (internal quotation marks and citation omitted).  The "mere existence of a scintilla of evidence" favoring the non-moving party will not prevent the entry of summary judgment; the evidence must be such that a rational trier of fact could reasonably find for the nonmoving party. *Id.* at 248–52.

Because this case invokes the Court's diversity jurisdiction, the Court's role is to apply controlling state law, or, if necessary, predict how the West Virginia Supreme Court of Appeals would rule on an unsettled issue. *McFarland v. Wells Fargo Bank, N.A.*, 810 F.3d 273, 279 (4th Cir. 2016). The Court should apply the relevant principles of state law as it believes they would be applied by the West Virginia Supreme Court of Appeals in this context.  *Id.*

**B.      Antero Is Entitled to Summary Judgment on Plaintiffs' Claims for Specific Enforcement of Audit Provisions.**

Antero is entitled to summary judgment on Plaintiffs' claims for specific performance of audit provisions because Plaintiffs base their claims on the 1925 Freeman Modification, which has been superseded, and Armstrong has not complied with the conditions precedent to invoking the audit provision in the 2015 Armstrong Modification. In *Thornsbury v. Cabot Oil & Gas Corp.*, 231 W. Va. 676, 749 S.E.2d 569 (2013), the West Virginia Supreme Court of Appeals recognized that "[i]t is a well-established, fundamental principle of contract law that a valid, unambiguous written contract may be modified or superseded by a subsequent contract based on a valuable consideration." *Id.*, 749 S.E.2d at 573 (citation omitted). Likewise, in *Consolidation Coal Co. v. Mineral Coal Co.*, 147 W. Va. 130, 126 S.E.2d 194 (1962), the Court recognized:

> A mineral lease may be modified by agreement of the parties provided the modification is supported by a sufficient consideration; and the modification may consist of the new terms and as much of the old lease as the parties have agreed shall remain unchanged, in which case the terms and conditions of the original lease, so far as consistent with the modified contract, will remain in full force and effect and become incorporated in the modified contract.

*Id.*, 126 S.E.2d at 201 (citations omitted). *See also* Syl. Pt. 3, *Myers v. Carnahan*, 61 W. Va. 414, 57 S.E. 134 (1907) ("Where a new contract is made with reference to the subject-matter of a former contract . . . the obligations of the earlier contract, in so far as they are inconsistent with the later one, will be abrogated and discharged, and the two contracts will be construed together, disregarding the provisions of the original which are inconsistent with those of the latter."); 58 C.J.S. *Mines and Minerals* § 298 (Nov. 2020 Update) ("The parties to an oil and gas lease may modify the lease . . . *and the rights and liabilities of the parties thereafter are controlled by the terms and conditions of the lease as modified*." (emphasis added)).

Plaintiffs base their claims for specific performance of an audit on a single sentence in the royalty provision of the 1925 Freeman Modification, which states:

> And in the event the parties of the first part are not satisfied with such statements of amount of gas delivered and sold from the premises, the parties of the second part, by themselves or their agent, shall have the right of access for an inspection of the original meter charts taken from said wells; and they may also inspect the statement furnished by the Company that purchases all gas from said wells.

*Armstrong*, ECF No. 20 at 12, 20-2; *Reynolds*, ECF No. 18 at 12, 18-2; *see also* Ex. B.

Plaintiffs allege that, "[d]ue to Antero's refusal to acknowledge the application of the lease requirements . . . and Antero's refusal to provide documentation supporting its calculations of production . . . , Plaintiff[s] must seek this Court's intervention to require Antero to specifically perform its obligations under said Lease Agreements." *Armstrong*, ECF No. 20 at 12–13; *Reynolds*, ECF No. 18 at 12.

Antero has not acknowledged the application of the lease requirements alleged by Plaintiffs because the 1925 Freeman Modification upon which they rely has been superseded for valuable consideration by subsequent modifications, including, significantly, the 2015 Armstrong Modification and the 2014 Reynolds Modification. Indeed, the 2015 Armstrong Modification and the 2014 Reynolds Modification modify and ratify the Freeman Lease as amended thereby without reference to or ratification of the 1925 Freeman Modification or any other modification. *See* Ex. E at 4; Ex. F at 4.

Even if the 1925 Freeman Modification were not superseded, it would not entitle Plaintiffs to the relief sought. The sentence in the 1925 Freeman Modification relied upon by Plaintiffs only applied if the lessors were not satisfied with the statements of the entire amount of gas produced and saved from the leased premises during the preceding month (excepting two gas wells). Plaintiffs do not allege that they are dissatisfied with the statements of the entire amount of gas produced and save from the wells on the Freeman Lease. Instead, Plaintiffs allege that they are dissatisfied with Antero's royalty statements only insofar as such royalty statements do not provide

information to show how Antero calculates its weighted average sales price ("WASP") and/or MCF price. *Armstrong*, ECF No. 20 at 12; *Reynolds*, ECF No. 18 at 12.[7]  Dissatisfaction with statements insofar as they relate to such price issues does not trigger the sentence relied upon by Plaintiffs in the 1925 Freeman Modification.[8]

In addition, the 1925 Freeman Modification only entitled Plaintiffs to inspect original meter charts and statements furnished by the purchaser of gas taken from their wells. Plaintiffs do not allege that they requested an opportunity to inspect such original meter charts and statements furnished by the purchaser of gas. Instead, Plaintiffs allege only that they requested Antero to provide documentation supporting Antero's calculations by letter dated April 19, 2019. *Armstrong*, ECF No. 20 at 12; *Reynolds*, ECF No. 18 at 12. The letters attached to the amended complaints, which are dated April 12, 2019 (not April 19), requested Antero to provide documentation supporting its calculations of royalties, referencing the 1925 Freeman Modification. *Armstrong*, ECF No. 20-4 at 3; *Reynolds*, ECF No. 18-4 at 3.  Before filing suit, however, Plaintiffs did not request to inspect original meter charts and statements furnished by the purchaser of gas, which are the only documents ever subject to inspection under the 1925 Freeman Modification.

Neither Armstrong's amended complaint nor the letter attached invokes the audit provision contained in the 2015 Armstrong Modification.[9] In any event, that audit provision requires thirty days' notice by certified mail of an intended audit, which must be conducted at Antero's office during business hours at Armstrong's cost and expense. That audit provision further provides that

---

[7] Based on the timing of their initial request, Plaintiffs patently could not have been dissatisfied with Antero's royalty statements because they had not yet received any royalty payments pertaining to wells on the Freeman Lease.  *See, e.g.*, *Armstrong*, ECF No. 20-4 (stating Plaintiffs had not received royalty payments for production from the Freeman Lease and invoking right to inspect records under 1925 Freeman Modification).
[8] Notwithstanding the fact that the right to inspect records in the 1925 Freeman Lease is inoperative, Antero has provided information pertaining to its WASP as well as voluminous gas sales invoices in discovery.
[9] The 2014 Reynolds Modification does not contain an audit provision.

in no case will Armstrong be permitted to take documents outside Antero's office. Armstrong has

not requested an audit in conformity with the only operative audit provision. Therefore, Antero is

entitled to summary judgment on Plaintiffs' claims for specific performance of audit provisions.

### C.     Antero Is Entitled to Summary Judgment on Plaintiffs' Claims for Failure to Properly Account for Royalties.

Antero is also entitled to summary judgment on Plaintiffs' claims for failure to properly

account for royalties, which are premised upon an implied duty of good faith and fair dealing. As

a threshold matter, this Court already has dismissed Plaintiffs' independent claims for breach of

the duty of good faith and fair dealing in their original complaint with prejudice. *Armstrong*, ECF

No. 15; *Reynolds*, ECF No. 13. The similar claims in the amended complaints clearly exceed the

scope of the Court's Order, which only granted Plaintiffs leave to amend their complaints "to

allege a complete contract." *Armstrong*, ECF No. 15; *Reynolds*, ECF No. 13.

In any event, in *Mills Wetzel Lands, Inc. v. EQT Production Co.*, No. 5:18cv23, 2019 WL

286748, at *5–6 (N.D. W. Va. Jan. 22, 2019), this Court dismissed a similar claim wherein the

plaintiff alleged that the defendants violated the implied covenant of good faith and fair dealing

by failing and refusing to provide the plaintiff with honest, accurate, and complete statements and

accounting of all oil, natural gas, NGLs, and other hydrocarbons produced and sold, the amounts

received or value upon which royalties should be paid, and accurate and timely payments of these

royalties. The Court concluded as follows:

> Under West Virginia law, breaches of implied covenants do not "provide a cause
> of action apart from a breach of contract claim." *Gaddy Eng'g Co. v. Bowles Rice
> McDavid Graff & Love, LLP*, 746 S.E.2d 568, 578 (W. Va. 2013) (internal
> quotation marks omitted). Rather, such claims "sound[ ] in breach of contract." *Id.*
> (internal quotation marks omitted). West Virginia law recognizes that "'in every
> contract there exists an implied covenant of good faith and fair dealing.'" *Burbach
> Broad. Co. of Delaware v. Elkins Radio Corp.*, 278 F.3d 401, 409 (4th Cir. 2002)
> (quoting *Harless v. First National Bank in Fairmont*, 246 S.E.2d 270, 274 (W. Va.
> 1978)). West Virginia law does not, however, recognize an independent cause of
> action for the breach of an implied covenant of good faith and fair dealing separate

and apart from a breach of contract claim. *Stand Energy Corp. v. Columbia Gas Transmission Corp.*, 373 F. Supp. 2d 631, 644 (S.D. W. Va. 2005); *see also Warden v. PHH Mortg. Corp.*, No. 3:10-cv-75, 2010 WL 3720128, at *5 (N.D. W. Va. Sept. 16, 2010).

*Id.* at *6; *see also, e.g.*, *Packard v. Antero Res. Corp.*, No. 1:18cv04, 2018 WL 2348398, at *3 n.3 (N.D. W. Va. May 23, 2018) (dismissing a standalone claim for breach of the implied covenant of good faith and fair dealing); *Rodgers v. Southwestern Energy Co.*, No. 5:16cv54, 2016 WL 3248437, at *4 (N.D. W. Va. June 13, 2016) (same).

In this action, Plaintiffs' claims for failure to properly account for royalties states:

53.    Antero has an affirmative contractual duty to account for and pay Plaintiff the true and correct royalty due to him by virtue of the above described Freeman Leasehold, *the contractual duty of good faith and fair dealing implied in all contracts*, and by virtue of its duty of ordinary prudence and responsibility of an oil and gas lessee who is responsible for the production, marketing and sales of natural gas, oil casinghead gas and/or by products.

. . .

55.    Plaintiff is entitled to an accounting of all proceeds from sales of all of the oil, gas and other by-products of the wells described above . . . , and any deductions therefrom made by Antero.

*Armstrong*, ECF No. 20 at 12–13 (emphasis added); *Reynolds*, ECF No. 18 at 12–13 (emphasis added).

This action is indistinguishable from *Mills Wetzel Lands* and other cases where this Court has dismissed claims, including demands for an accounting, based on the implied duty of good faith and fair dealing. Plaintiffs do not cite any language in their leases giving them the right to an accounting; instead, Plaintiffs rely solely on a contractual duty of good faith and fair dealing to support these claims. Plaintiffs cannot repackage their claims for breach of the implied duty of good faith and fair dealing from their original complaints, which already have been dismissed with

prejudice, as baseless claims for an accounting.[10] Therefore, Antero is also entitled to summary judgment on Plaintiffs' claims for failure to properly account for royalties based on an implied duty of good faith and fair dealing.

### D. Antero Is Entitled to Summary Judgment on Plaintiffs' Claims for Breach of Contract for Failure to Pay Royalties Due.

Finally, Antero is entitled to summary judgment on Plaintiffs' claims for breach of contract for failure to pay royalties due because Plaintiffs failed to identify specific lease terms Antero purportedly breached, Antero has not breached the Freeman Lease as modified, and Antero has paid more royalties than required.  Accordingly, Plaintiffs have no injury as a matter of law.  In *Richards v. EQT Production Co.*, No. 1:17cv50, 2018 WL 3321441 (N.D. W. Va. July 5, 2018), this Court held that, in order to prevail on a motion for summary judgment on a breach of contract claim under West Virginia law, a plaintiff must establish the following four elements: (1) the existence of a valid, enforceable contract; (2) that the plaintiff has performed under the contract; (3) that the defendant has breached or violated its duties or obligations under the contract; and (4) that the plaintiff has been injured as a result. *Id.* at *3. *See Packard v. Antero Res. Corp.*, No. 1:18cv04, 2018 WL 2348398, at *4 (N.D. W. Va. May 23, 2018) (listing same elements of a breach of contract claim under West Virginia law); *Reynolds v. Ascent Resources-Marcellus, LLC*, 1:16cv77, 2017 WL 1959220, at *4 (N.D. W. Va. May 11, 2017) (same). On the other hand, in order to prevail on a motion for summary judgment on a breach of contract claim, a defendant need only establish the inverse of at least one of the four elements. *Id.*  Plaintiffs have not sufficiently specified the first element and cannot prove the third or fourth elements of their breach of contract claims as a matter of law.

---

[10] In any event, Antero provided royalty data pertaining to the Freeman Lease in addition to information pertaining to its WASP as well as voluminous gas sales invoices in discovery.

### 1.    Plaintiffs failed to identify specific lease terms Antero purportedly breached.

As a threshold matter, despite multiple opportunities to do so, Plaintiffs persistently have failed to identify specific lease terms Antero purportedly breached in this action.  In *Rodgers v. Southwestern Energy Co.*, No. 5:16-CV-54, 2016 WL 3248437 (N.D. W. Va. June 13, 2016), the Court required the plaintiffs to amend their complaint alleging improper deductions from gas lease royalties after the Chesapeake defendants argued that the claim had not been sufficiently pled because, in part, the plaintiffs did not identify any language regarding royalty provisions, the amounts paid or underpaid, or any other specific details regarding the contract.  *Id.* at * 2–3.  *See Knisely v. Nat'l Better Living Ass'n, Inc.*, No. 3:14CV15, 2014 WL 4084517 (N.D. W. Va. Aug. 19, 2014) (dismissing breach of contract claim because plaintiff had not sufficiently alleged which policy provisions were breached); *Cincinnati Ins. Co. v. Cost Co.*, No. 5:10-CV-7, 2010 WL 1902995, at *3 (N.D. W. Va. May 11, 2010) (dismissing breach of contract claim where plaintiff did not allege which provisions were breached).

As was the case in *Rodgers*, Plaintiffs do not plead any language regarding royalty provisions, the amounts paid or underpaid, or any other specific details regarding the parties' contract as it pertains to the payment of royalties.  Critically, Plaintiffs fail to identify which document or documents attached to their amended complaints – the 1925 modification or 2015 Armstrong Modification and 2014 Reynolds Modification – contain the royalty provision or provisions upon which they rely for relief, let alone any specific terms Antero purportedly breached. It is impossible for both this Court and Antero to decipher which royalty provision or provisions Plaintiffs contend Antero allegedly has breached.  Accordingly, Plaintiffs fail to put Antero or this Court on notice of plausible claims for breach of contract.  For this reason alone, Antero is entitled to summary judgment on Plaintiffs' breach of contract claims for royalties due.

## 2.     Antero has not breached the Freeman Lease as modified.

Moreover, Antero has properly paid Plaintiffs royalties and therefore has not breached the Freeman Lease as modified by the 2015 Armstrong Modification and 2014 Reynolds Modification. Specifically, Antero has not taken deductions and has properly paid Plaintiffs royalties based upon its WASP. In *K & D Holdings, LLC v. Equitrans, L.P.*, 812 F.3d 333 (4th Cir. 2016), the Fourth Circuit construed an oil and gas lease, observing that "West Virginia contract law principles apply equally to the interpretation of leases." *Id.* at 339 (citing *Energy Dev. Corp. v. Moss*, 214 W. Va. 577, 591 S.E.2d 135, 143 (2003)). In that case, the court rejected the plaintiff's argument that oil and gas leases should be liberally construed in favor of the lessor. The court recognized the general rule but held that the rule does not apply unless there is an ambiguity as to the meaning of the lease terms.  The court concluded that the language of the lease at issue in that case was clear and not subject to the rule of construction advocated by the plaintiff. The court further found the plaintiff's arguments based on fairness and West Virginia public policy unavailing in interpreting the unambiguous lease. *Id.* at 339–40 & n.7.

Recently, in *Young v. Equinor USA Onshore Properties, Inc.*, 982 F.3d 201, 208–09 (4th Cir. 2020), the Fourth Circuit vacated the Court's grant of summary judgment for the plaintiffs and remanded the case for entry of summary judgment for the defendants, holding that the oil and gas lease unambiguously allowed the defendants to deduct costs from royalties using the "work-back" method adopted by the West Virginia Supreme Court of Appeals in *Leggett v. EQT Production Co.*, 239 W. Va. 264, 800 S.E.2d 850 (2017).  The royalty provision in *Young* granted the lessors a royalty share that was a percentage of the net amount realized by the lessees computed at the wellhead, stated that post-production costs incurred by the lessee between the wellhead and point of sale would be deducted from the gross proceeds to calculate the net amount realized at the wellhead, and specified seven types of such post-production costs between the wellhead and point

of sale that would be deducted, and allowed the lessees to either contract with others or to perform post-production operations themselves. *Id.* at 203–04.   In holding that the royalty provision unambiguously allowed deductions, the court rejected the plaintiffs' argument that the lease failed to satisfy West Virginia's requirements for allocating post-production costs to the lessors under *Estate of Tawney v. Columbia Natural Resources, LLC*, 219 W. Va. 266, 633 S.E.2d 22 (2006). *See Young*, 982 F.3d at 205.

    *Young* began its analysis with a discussion of *Wellman v. Energy Resources, Inc.*, 210 W. Va. 200, 557 S.E.2d 254 (2001), in which the court explained "West Virginia's high court held that where 'an oil and gas lease provides *for a royalty based on proceeds received by the lessee*, unless the lease provides otherwise, the lessee must bear all costs incurred in exploring for, producing, marketing, and transporting the product to the point of sale.'" *Young*, 982 F.3d at 206 (quoting *Wellman*, 557 S.E.2d at 265) (emphasis added).

    *Young* next explained how *Tawney* expanded on *Wellman* by establishing a three-pronged test to rebut "the *Wellman* presumption" as follows:

> *Tawney* explained that an oil and gas lease that intends to allocate post-production costs between the lessor and lessee must: (1) "expressly provide that the lessor shall bear some part of the costs incurred between the wellhead and the point of sale"; (2) "identify with particularity the specific deductions the lessee intends to take from the lessor's royalty"; and (3) "indicate the method of calculating the amount to be deducted from the royalty for such post-production costs." 633 S.E.2d at 30. Applying this test, *Tawney held that lease language that provides for the lessor's royalty to be calculated "at the wellhead" is ambiguous, and therefore fails to rebut the Wellman presumption under the first prong*.

*Young*, 982 F.3d at 206 (emphasis added).

    *Young* continued with analysis of *Leggett* and recognized *Leggett*'s conclusion that *Wellman* and *Tawney* did not inform the interpretation of West Virginia's flat-rate royalty statute, W. Va. Code § 22-6-8, and that the statute permitted the deduction of post-production costs using

the work-back method. *Young*, 982 F.3d at 206. The court in *Young* found the criticism of

*Wellman*'s and *Tawney*'s "faulty legs" in *Leggett* compelling, reasoning as follows:

> The [*Leggett*] court recited an array of "stinging" criticism from scholars complaining that *Wellman* and *Tawney* rest on an "unwillingness to accept the realities of deregulation in the natural gas market." *Id.* at 863. From 1938 until the "deregulation" that occurred in 1993, buyers "purchased gas at or near the wellhead, thereby absorbing most post-wellhead [i.e., post-production] costs." *Id.* at 857 n.10. Today, however, "most gas is purchased away from the wellhead," giving rise to vastly greater post-production costs incurred by the seller. *Id.* Given this new reality, the court hinted (without formally holding) that *Wellman* and *Tawney* are "nothing more than a re-writing of the parties' contract to take money from the lessee and give it to the lessor." *Id.* at 863.
>
> *Leggett did, however, expressly reject Tawney's assertion that the phrase "at the wellhead" is facially ambiguous. Instead, it interpreted the statutory phrase to require the calculation of royalties based on "the value of the gas at the well, before it is transported, treated, compressed or otherwise prepared for market." Id. at 864–65. The court determined that "the most logical way to ascertain the wellhead price" under section 22-6-8 is "to deduct the post-production costs from the 'value-added' downstream price." Id. at 866. This "'work-back' method of royalty calculation" prevents lessors from "unfairly maximiz[ing] their royalty payments without commensurately bearing the costs of achieving that maximum value." Id. at 867.*
>
> Reading these cases together, we glean the following principles of West Virginia law: *An oil and gas lease must satisfy Tawney's three-pronged test to rebut the Wellman presumption that the lessee will bear all post-production costs. And although Leggett didn't overrule Wellman and Tawney, its criticism of those cases and its endorsement of the work-back method inform our analysis here.*

*Young*, 982 F.3d at 207 (second and third alterations in original) (emphasis added) (footnote

omitted).

Significantly, *Young* rejected the plaintiffs' argument challenging the reasonableness of

deductions, observing that "'"[r]easonableness" is a common legal standard that has been used by

courts for more than a century' and simply limits any deductions to those that are rationally related

to the specified categories of post-production costs." *Id.* at 208 (citing *W.W. McDonald Land Co.*

*v. EQT Prod. Co.*, 983 F. Supp. 2d 790, 808 (S.D. W. Va. 2014)). The Fourth Circuit concluded:

> In sum, we are satisfied that the lease suffices under *Tawney* to indicate the method for calculating the amount of post-production costs to be deducted when calculating the Young's royalties. That method is simply to add up all of the identified, reasonable, and actually incurred post-production costs, and deduct them from [the defendants'] gross proceeds. The amount is then adjusted for the Young's fractional share of the total pooled acreage and their royalty rate. Especially in light of *Leggett*, West Virginia law demands no more.

*Id.* at 209.

Consistent with *Leggett*'s criticism, in *Cather v. EQT Production Co.*, No. 1:17cv208, 2019 WL 3806629 (N.D. W. Va. Aug. 13, 2019), this Court cited with approval a synthesized reading of *Wellman* and *Tawney* that concluded that "lessees have a duty to bear all costs incurred until the gas reaches *market, not to a point of sale.*" *Id.* at *3 (emphasis added) (citing *W.W. McDonald Land Co.*, 983 F. Supp. 2d at 800). In *W.W. McDonald Land Co.*, the court held that the market was the first place downstream of the well where the gas can be sold to any willing buyer and title passed to that buyer. *Id.* at 803. *But cf. Richards*, 2018 WL 3321441, at *5 n.1 (distinguishing and declining to apply *Tawney* to wellhead sales because "[t]he holding in *Tawney* presumes a sale of gas downstream from the wellhead").

In this action, Plaintiffs allege as follows with regard to their breach of contract claims:

> 59.   Upon information and belief, Antero has breached the terms of the subject Lease Agreements by failing to pay Plaintiff the royalties he is owed from the production of the wells . . . utilizing the WASP determined by Antero.

> 60.   The lease contract between Plaintiff and Antero does not allow for deductions from the gross revenue for expenses of the wells, transportation of gas, or for any other reason in calculating the royalties due Plaintiff.

> 61.   By wrongfully making the deductions from payment of royalties due Plaintiff as described above, Antero has breached the terms of the lease contract between them.

*Armstrong*, ECF No. 20 at 14; *Reynolds*, ECF No. 18 at 14.

Notwithstanding the fact that Antero has not taken any deductions in this action, *see* Schopp Dep. Tr. 55:19–21, 56:6–12, 153:19–21,[11] the 2014 Reynolds Modification and 2015 Armstrong Modification allow Antero to do so.  Specifically, the 2014 Reynolds Modification contains the following: royalty provision:

> <u>Market Enhancement (Gross Proceeds) Clause</u>  It is agreed between the Lessor and Lessee that all oil, gas, liquids or other proceeds accruing to the Lessor under this lease or by state law shall be without deduction, directly or indirectly, for the cost of producing, gathering, storing, separating, treating, dehydrating, compressing, processing, transporting, and marketing the oil, gas, liquids and other products produced hereunder to transform the product into marketable form.

Ex. E at 4.

In addition, the addendum to the 2015 Armstrong Modification contains the following: royalty provision:

> 1.       OIL AND GAS ROYALTY. Lessee shall pay Lessor royalty of One Eighth (12.5%) of the amount realized by Lessee from the sale of any oil and gas present in and associated with any formations, horizons, strata or zones produced and sold by Lessee. For all purposes of Addendum, references to oil and gas or either or both of them shall mean oil, or gas, or both and all substances which are constituents of or produced with oil or gas, whether similar or dissimilar or produced in a gaseous, liquid, or solid state. It is agreed between the Lessor and Lessee that, notwithstanding any language herein to the contrary, all oil, gas or other proceeds accruing to the Lessor under this lease or by state law shall be without deduction, directly or indirectly, for the cost of producing, gathering, storing, separating, treating, dehydrating, compressing, processing, transporting, and marketing the oil, gas and other products produced hereunder to transform the product into marketable form. In no event shall lessor receive a price that is less than or more than the price received by Lessee.

Ex. F at 5.

In this action similar to *Young*, the 2015 Armstrong Modification and 2014 Reynolds Modification unambiguously provide that Plaintiffs will bear post-production costs and identify the post-production costs with particularity. Under the canon of *expressio unius est exclusio*

---

[11] A copy of the transcript of the deposition of Alvyn A. Schopp is attached as "Exhibit G."

*alterius*, to express or include one thing implies the exclusion of the other, or of the alternative. In *Bischoff v. Francesa*, 133 W. Va. 474, 56 S.E.2d 865 (1949), the West Virginia Supreme Court of Appeals held: "In the interpretation of written instruments 'the express mention of one thing implies exclusion of another, *expressio unius est exclusio alterius* * * *.'" *Id.* at Syl. Pt. 3.[12] *See Westfield Ins. Co. v. Chico*, No. 1:15cv116, 2016 WL 4548444, at *7 & n.7 (N.D. W. Va. Aug. 31, 2016) (holding that insurance policy was not ambiguous and applying canon of *expressio unius est exclusio alterius* to hold that the insurer's specific enumeration of offenses triggering coverage was intended to exclude other offenses). In this action as well, the language of the 2015 Armstrong Modification and 2014 Reynolds Modification is unambiguous and allows for deduction of post-production costs.

The canon of *expressio unius est exclusio alterius* applies to the language in the 2015 Armstrong Modification that "all oil, gas or other proceeds accruing to the Lessor under this lease or by state law shall be without deduction, directly or indirectly, for the cost of producing, gathering, storing, separating, treating, dehydrating, compressing, processing, transporting, and marketing the oil, gas and other products produced hereunder to transform the product into marketable form." The canon of *expressio unius est exclusio alterius* also applies to the language in the 2014 Reynolds Modification that "all oil, gas, liquids or other proceeds accruing to the Lessor under this lease or by state law shall be without deduction, directly or indirectly, for the

---

[12] *Bischoff* is particularly instructive because the contract raised an issue that was the converse of the issue in this action. In *Bischoff*, the question was whether the defendants were entitled to deduct a proportionate share of their general overhead from the plaintiffs' compensation under the terms of a contract. The parties had agreed to apportion the cost of a bond premium by express provision of the contract, but as to the other items the contract was silent on apportionment. The Court began its analysis by holding that the contract, although so inept in language as to render interpretation difficult, was unambiguous. *Id.*, 56 S.E.2d at 870. The Court applied the canon of *expressio unius est exclusio alterius* to hold that the parties, having provided to apportion the cost of the bond premium by express provision excluded such provision as to the other items of cost and expense on the work to be performed by the plaintiffs. The Court reasoned that the parties had in mind the question of apportionment; however, the contract was silent on that question as to the other items. *Id.*, 56 S.E.2d at 873.

cost of producing, gathering, storing, separating, treating, dehydrating, compressing, processing, transporting, and marketing the oil, gas, liquids and other products produced hereunder to transform the product into marketable form." Because both the 2015 Armstrong Modification and 2014 Reynolds Modification state that Antero may not take specified deductions to transform the product into a marketable form, Antero may take those specified deductions once the product is in marketable form.  It is undisputed that Antero's gas is in a marketable form at the wellhead.  *See* Schopp Dep. Tr. 54:24–55:11 (stating that gas "is in a marketable form at the wellhead"); Terry Dep. at 48:19–49:24 (discussing the fact that gas can be marketable at the wellhead);[13] *id.* at 70:13–22 (same); *id.* at 93:12–22 (same); Terry Report at 7–9 (same).[14]

In addition similar to *Young*, the 2015 Armstrong Modification and 2014 Reynolds Modification indicate the method for calculating the amount of post-production costs to be deducted when calculating Plaintiffs' royalties.  That method is simply to add the identified, reasonable, and actually incurred post-production costs once the product is in marketable form and deduct them from Antero's gross proceeds to get the amount realized.  That amount realized is then adjusted for Plaintiffs' fractional share of the total pooled acreage and their royalty rates.  Specifically, the 2015 Armstrong Modification and 2014 Reynolds Modification provide: "The royalties provided for in the lease shall be tendered or paid to Lessor in the proportion that Lessor's acreage in the Pooled Area(s) bears to the total Pooled Area."  Ex. F at 4; Ex. E at 4.  Moreover, Antero pays royalties to Armstrong and Reynolds at the rate of 12.5%.  *See, e.g.*, Ex. F at 5.  Because the Armstrong 2015 Modification and Reynolds 2014 Modification unambiguously allow Antero to deduct costs from royalties using the work-back method adopted in *Leggett*, Antero has not breached the Freeman Lease as modified.

---

[13] A copy of the transcript of the deposition of Kris L. Terry is attached as "Exhibit H."
[14] A complete copy of the Declaration and Expert Report of Kris L. Terry is attached as "Exhibit I."

Moreover, contrary to Plaintiffs' vague assertion, Antero has not breached the Freeman Lease as modified by utilizing its WASP.  As discussed in more detail below, Antero's WASP historically has been higher than local index prices, thereby exceeding the royalties to which Plaintiffs would otherwise be entitled, and Plaintiffs fail to identify any language that would prohibit such practice.  For these additional reasons, Antero is entitled to summary judgment on Plaintiffs' claims for breach of contract for royalties due.

### 3. Plaintiffs have no injury because Antero has taken no deductions and has paid more royalties than required.

Finally, Plaintiffs have no injury because Antero has taken no deductions and has paid more royalties than required under the Freeman Lease as modified.  Notwithstanding the fact that Antero is permitted to take deductions under the 2015 Armstrong Modification and 2014 Reynolds Modification, the undisputed evidence demonstrates that Antero has not taken any stated deductions from Plaintiffs' royalties under the Freeman Lease as modified.  *See* Schopp Dep. Tr. 55:19–21, 56:6–12, 153:19–21.

The only so-called deduction Plaintiffs specify in their amended complaint is "shrink."  *See Armstrong*, ECF No. 20 at 11; *Reynolds*, ECF No. 11. Shrink simply is not a deduction.  Antero's expert, Kris L. Terry, explained Antero's upgrade calculation and the impact of "shrink" in her expert report as follows:

> 43.    Conceptually, each month before Antero pays royalties it determines whether the revenue obtained from processing gas resulted in an improvement of the value of the gas. It applies a methodology in paying royalties referred to as its "Upgrade Calculation." This calculation of the net value at the factory ("net factory value") involves comparing the value of the NGLs, after costs, to the value of the wellhead MMBTUs that were converted to NGLs in order to determine whether or not processing the gas and extracting the NGLs enhanced the value, i.e., resulted in a greater value than not processing. To make this determination, Antero focuses its evaluation on the "shrink."

> 44.    "Shrink" or "Shrinkage" in the industry custom and practice means the hydrocarbon (volume) reduction of the gaseous stream that occurs when the

entrained liquefiable hydrocarbons are converted from their gaseous state to liquid state. Antero's practice is to determine the unique hydrocarbon make-up of each well because each well yields a certain volume of NGLs. These NGLs (in this case, the purity products) sell for a certain amount every month. And, the NGLs have a certain BTU content. Therefore, Antero determines the MMBTU of the shrinkage and multiplies it by Antero's WASP. If the value of the NGLs, minus the cost of processing, exceeds the value of the "shrink," Antero generally pays royalties on the NGLs and deducts the processing costs ("PRC2"). If the net factory value of the NGLs does not exceed the value of the "shrink," Antero instead pays royalties on the wellhead MMBTU of the gas multiplied by the WASP.

. . .

46.     As to these Plaintiffs, however, Antero paid royalties on the NGL value without deduction of the PRC2 costs in months where the net NGL value exceeded the value of the shrink. The result is that Plaintiffs have been paid on a price greater than the price received by Antero in such months. In the months in which the value of the NGLs did not result in a greater value, the Plaintiffs have been paid royalties on the wellhead MMBtu with zero deductions, also a greater price than received by Antero.

Terry Report at 11–12 (footnote omitted).

As Antero's designated corporate representative testified, Antero's position is that it can take deductions pursuant to both the 2014 Reynolds Modification and 2015 Armstrong Modification once the product is in a marketable form.  *See* Schopp Dep. Tr. 20:12–21:2. Specifically, each Plaintiff could have been charged a total of $245,072.68 in deductions once the product is in a marketable form at the wellhead.  *See* Schopp Decl. at 1 & Ex. 1 (discussing deductions that could have been attributed to the 2014 Reynolds Modification and 2015 Reynolds Modification).[15]  However, Antero's designated corporate representative confirmed that Antero is not currently taking deductions from Plaintiffs.  *See* Schopp Dep. Tr. 55:19–21; *id.* at 56:6–12 (confirming Plaintiffs have not been charged deductions for PRC2); *id.* at 153:19–21 (confirming Plaintiffs have not been charged TRN3).  Thus, the undisputed evidence shows that Antero paid more than it was required in royalties to these Plaintiffs on the Freeman Lease as modified.

---

[15] The Declaration of Alvyn A. Schopp and exhibit thereto are collectively attached as "Exhibit J."

Moreover, Antero did not underpay royalties under the 2015 Armstrong Modification or 2014 Reynolds Modification by utilizing its WASP. Plaintiffs have not articulated anything beyond mere speculation approaching a coherent theory as to how "the WASP as calculated by Antero is weighted in favor of the interests of Antero and against the interests of Plaintiff, thereby causing Plaintiff a loss of royalties to which he is entitled." *Armstrong,* ECF No. 20 at 11; *Reynolds*, ECF No. 18 at 11. Despite the baseless allegations in the amended complaints, the undisputed evidence shows that Antero's WASP has operated to Plaintiffs' benefit.

As Ms. Terry testified in her report, Plaintiffs' expert "has not calculated any damages related to the residue portion of the gas sold" and "contends that he does not have enough data to verify Antero's calculation of its [WASP]." Terry Report at 14. In spite of the fact that Antero produced thousands of pages of gas sales invoices and WASP summaries in discovery, Plaintiffs' expert maintained a lack of data as the reason he has not "calculated an asserted amount for the residue gas WASP price." Phend Dep. Tr. 78:7–16.[16] Notably, Plaintiffs' expert admitted during his deposition that he did not cross-reference Antero's WASP against any index in this case. Phend Dep. Tr. 118:5–7.

Ms. Terry, however, prepared such a comparison, and testified as follows:

38.　　In my experience, index prices for a given area are widely regarded as representing market value for gas delivered to a pipeline in the area. And, they are generally more than market value at the well because they are "delivered to pipeline" prices, not wellhead prices. As can be seen in the attached Exhibit G, *Antero has on average achieved a weighted average sales price of $0.42 per MMBTU greater than the "delivered to pipeline" in-basin index prices for Dominion Transmission and Texas Eastern Transmission M-2.*

---

[16] A copy of the transcript of the deposition of Donald A. Phend, CPA is attached as "Exhibit K."

Terry Report at 10 (footnote omitted) (emphasis added).  In other words, the undisputed evidence shows that Antero's WASP exceeds index values on which Plaintiffs otherwise could be paid, thereby operating to their benefit rather than detriment.

In addition, in *W.W. McDonald Land Co. v. v. EQT Production Co.*, 983 F. Supp. 2d 790, 800 (S.D. W. Va. 2013), the court held in granting the plaintiffs' motion for clarification that lessees have no general duty to pay for unsold gas volumes, including but not limited to fuel gas consumed in compressor stations.  The court reasoned: "Like volumes of gas lost or unaccounted for due to pipeline leaks or metering inaccuracies, gas consumed as fuel to power compressors is not sold or marketed. Lessees are not generally obligated to pay royalties on unsold gas because lessees receive no payment for this gas." *Id.* at 817.  *See Anderson Living Tr. v. XTO Energy, Inc.*, No. 13-CV-941-SWS-KK, 2019 WL 4015210, at *11 (D.N.M. May 15, 2019) (holding royalties not owed on fuel gas citing *W.W. McDonald Land Co.* with approval).

In this regard, Antero indisputably has exceeded its obligations.  Notably, the unrefuted evidence shows that Plaintiffs' royalties were based upon wellhead volumes.  *See* Schopp Dep. Tr. 119:20–22 (stating that Antero pays royalties on the "total wellhead price" and adds back fuel before paying); Terry Dep. Tr. 112:3–8 (stating that Antero does not consider fuel in its royalty calculation); Terry Report at 8 ("In addition, the price paid to Plaintiffs has not been reduced for fuel or lost and unaccounted for gas).  Under *W.W. McDonald Land Co.*, however, Antero would be entitled to an offset for fuel.  Thus, Antero also has overpaid Plaintiffs by basing their royalties on unsold volumes of gas.  Accordingly, Plaintiffs cannot prevail on the injury elements of their breach of contract claims. For these additional reasons, Antero is entitled to summary judgment on the claims for breach of contract for royalties due.

24

IV.     **CONCLUSION**

For all of the foregoing reasons, the Court should grant this motion and enter summary judgment for Antero Resources Corporation on all claims in the first amended complaints in these consolidated actions.

*/s/ W. Henry Lawrence*

W. Henry Lawrence (WV State Bar #2156)
hank.lawrence@steptoe-johnson.com
Amy M. Smith (WV State Bar #6454)
amy.smith@steptoe-johnson.com
Justin A. Rubenstein (WV State Bar #9974)
justin.rubenstein@steptoe-johnson.com
Shaina D. Massie (WV State Bar #13018)
shaina.massie@steptoe-johnson.com

STEPTOE & JOHNSON PLLC        400 White Oaks Boulevard
      Of Counsel        Bridgeport, WV  26330
                     (304) 933-8000

                     Attorneys for Antero Resources Corporation

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 15th day of January 2021, I electronically filed the foregoing "Memorandum in Support of Antero Resources Corporation's Motion for Summary Judgment" with the Clerk of the Court using the CM/ECF System. I further certify that I served by email a full copy of "Memorandum in Support of Antero Resources Corporation's Motion for Summary Judgment" to the same counsel of record as listed below:

William E. Ford, Esquire
wef@ix.netcom.com
Ford Law Office
217 East Main Street
Clarksburg, WV 26301

Jonathan R. Marshall, Esquire
jmarshall@baileyglasser.com
Victor S. Woods, Esquire
vwoods@baileyglasser.com
Samuel A. Hrko, Esquire
shrko@baileyglasser.com
Bailey & Glasser, LLP
209 Capitol Street
Charleston, WV 25301

Scott A. Windom, Esquire
swindom@windomlawoffices.com
Windom Law Offices, PLLC
101 East Main Street
Harrisville, WV 26362

*/s/ W. Henry Lawrence*
W. Henry Lawrence (WV State Bar #2156)

12084457